# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Danielle Fergus,**

        **Plaintiff,**

**v.**                                          **Case No. 18-cv-2330-JWL**

**Faith Home Healthcare, Inc.,**

        **Defendant.**

## MEMORANDUM & ORDER

Plaintiff filed this lawsuit against her former employer, Faith Home Healthcare, Inc., alleging that her employment was terminated in retaliation for opposing discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Defendant then asserted counterclaims of conversion, tortious interference with business expectancy and breach of fiduciary duty. This matter is presently before the court on the parties' cross-motions for summary judgment on plaintiff's retaliation claim and plaintiff's motion for summary judgment on all counterclaims. As will be explained, defendant's motion for summary judgment on plaintiff's retaliation claim is granted and plaintiff's motion for summary judgment is granted as to each counterclaim. Plaintiff's motion for summary judgment on her retaliation claim is denied. With respect to plaintiff's retaliation claim, summary judgment is granted in favor of defendant because no reasonable jury could conclude that plaintiff engaged in protected opposition to race discrimination when she reported that the company's owner, on two occasions, asserted that he was not taking certain actions based on an employee's race. With respect to defendant's counterclaims, summary judgment in favor of plaintiff is granted because defendant

failed to allege any actual damages with respect to its counterclaims. Thus, no claims remain for trial.[1]

## I.    Facts

The following facts are uncontroverted or related in the light most favorable to the nonmoving party.  Defendant Faith Home Healthcare, Inc. (FHH) is a Kansas corporation. Beverly Kimzey is the owner, president and CEO of FHH.  Bob Blevins is Ms. Kimzey's brother. Mr. Blevins owns Sacred Hearth Health, Inc. (SHH).  Both Mr. Blevins and Ms. Kimzey are Caucasian.  FHH is in the business of providing skilled in-home nursing care and health-related services.  SHH is a holding company that provides services to entities, including FHH, that provide direct care to patients.  FHH and SHH share office space, employees, and human resource functions.  The parties vigorously dispute the relationship between FHH and SHH—defendant FHH contends that they are entirely separate and distinct entities, plaintiff contends that they operate as a single or joint employer.  Because the resolution of that issue has no bearing on the outcome of the motions, the court declines to address it.[2]

Plaintiff Danielle Fergus, a Caucasian woman, began working for FHH in June 2016 as the Director of Nursing.  In that role, plaintiff was responsible for scheduling nurses for patients,

---

[1] Rarely has the court been so frustrated by summary judgment submissions.  Both parties have set forth statements of allegedly uncontroverted facts that bear little resemblance to the particular testimony or document relied upon in support of those facts and largely ignore those portions of the record that contradict the story each party seeks to tell.  As a result, the court has spent an exorbitant amount of time combing through the submissions and the record in an effort to ascertain what facts truly are unconverted and what the material issues are in this case.

[2] Plaintiff is not attempting to hold SHH liable for anything—she undisputedly worked for FHH, she was terminated by FHH and she seeks to hold FHH liable for its own conduct.

training nurses, and managing nurses' care of patients. At all times relevant to this lawsuit, plaintiff's supervisor was Patty Clayborn, plaintiff's sister. Two other employees had offices in the same suite as plaintiff and Ms. Clayborn—Amber Pearson, an African-American woman who provided billing and audit services to both FHH and SHH, and Magan Brown, a Caucasian woman who worked as an intake coordinator for FHH. Ms. Pearson was the only African-American person employed by FHH and SHH.

Plaintiff's retaliation claim is based entirely on plaintiff's report to Ms. Clayborn that, on two occasions, Mr. Blevins made an allegedly discriminatory remark to Ms. Pearson. As will explained, plaintiff overheard the second of those remarks and Ms. Pearson told her about the first remark. Because the law requires plaintiff to show a reasonable belief that she was reporting race discrimination when she reported Mr. Blevins' comments, *see Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 980 (10th Cir. 2018), the court's recitation of the facts focuses primarily on whether the evidence, viewed in the light most favorable to plaintiff, is sufficient for a jury to conclude that plaintiff's belief that she was reporting race discrimination was reasonable. *See EEOC v. Rite Way Serv., Inc*., 819 F.3d 235, 243-44 (5th Cir. 2016) (information known to the complaining party but not revealed in his or her report is relevant when assessing the reasonableness of the employee's belief that the employer violated Title VII).

In February 2018, Mr. Blevins came to Ms. Pearson's office to advise her that he was going to be hiring more employees and that those new employees would potentially get to pick their offices from the empty offices available. According to Ms. Pearson, Mr. Blevins told her that he "wanted to give me the opportunity to choose before them since I had been there longer, and he jokingly stated that he didn't want to not give me that opportunity and then me assume that it was

because I was black." Ms. Pearson testified that although the comment made her feel "uncomfortable," she was not offended by it. In fact, Ms. Pearson testified that Mr. Blevins made it widely known in the office that she was his "favorite" employee. The evidence reflects that only Magan Brown overheard the remark. In any event, the parties do not dispute how Ms. Pearson later described the remark to plaintiff, what plaintiff perceived as Mr. Blevins' remark, or how plaintiff reported the remark to Ms. Clayborn—that Mr. Blevins did not want Ms. Pearson to think that she was not getting a certain office based on her race.[3] After Mr. Blevins left Ms. Pearson's office, Ms. Brown approached her and asked her about the comment.

What happened next is hotly contested. Defendant, supported by Ms. Pearson's testimony, asserts that Ms. Pearson told Ms. Brown that while she was uncomfortable about the remark, she was not offended by it and wanted to "let it go." Defendant further contends that Ms. Brown told Ms. Pearson that she should feel offended, that the remark was inappropriate, and that she should start documenting things said by Mr. Blevins. Ms. Pearson testified that Ms. Brown shared the comment with Ms. Clayborn, and that Ms. Brown and Ms. Clayborn then began trying to convince Ms. Pearson that Mr. Blevins was a "racist" and that they should join together to file a lawsuit against him. Ms. Pearson testified that Ms. Clayborn told Ms. Pearson that she was the only one

---

[3] Plaintiff's counsel summarizes this statement in plaintiff's submissions as "Blevins telling Pearson she was not getting an office at work because of her race" and asserts that the comment expressly "referenced an adverse action based on Pearson's race." The only evidence that supports this characterization of the evidence is Ms. Clayborn's deposition and affidavit. That evidence, however, is irrelevant. Significantly, there is no evidence that plaintiff believed or reported that Mr. Blevins told Ms. Pearson that she was not getting an office based on her race. Viewed in the light most favorable to plaintiff, the evidence reflects only that plaintiff believed and reported that Mr. Blevins told Ms. Pearson that he was <u>not</u> discriminating against her based on her race.

who did not receive a Christmas bonus; that she was hired only to fill a "quota"; and that Mr. Pearson was underpaid. The record is devoid of any evidence as to the source of Ms. Clayborn's knowledge as to these issues or the truth of these statements. According to Ms. Pearson, Ms. Clayborn attributed these factors to Ms. Pearson's race and to Mr. Blevins' alleged racism. For purposes of the limited issue here, however, it is significant only that plaintiff does not contend that she had information—right or wrong—that Ms. Pearson was hired to fill a quota, that Ms. Pearson's race had any bearing on any bonus or compensation decision, or that Mr. Blevins made any employment decisions based on Ms. Pearson's race. Ms. Pearson further testified that, during this time frame, Ms. Clayborn told her that she "was going to bring Bob Blevins down." Ms. Clayborn and Ms. Brown generally deny stirring up trouble and testified that they were genuinely concerned about Mr. Blevins' remark. The record, however, contains copies of group text messages among Ms. Brown, Ms. Clayborn and plaintiff in which they discuss suing Mr. Blevins and starting their own home health care agency with the proceeds. Ms. Brown, Ms. Clayborn and plaintiff all testified that the text messages were sent in jest.

On Friday, March 23, 2018, several employees met at a bar after work. Ms. Pearson did not attend that outing, but plaintiff, Ms. Brown and Ms. Clayborn were in attendance, along with several other SHH and/or FHH employees. Ms. Clayborn announced at that event that Ms. Pearson was planning to sue Mr. Blevins for race discrimination. Plaintiff does not dispute this fact. Kortney Randall, defendant's human resources representative, heard Ms. Clayborn's statement and expressed concern because she was not aware of any discrimination reports or concerns in the office. Ms. Randall immediately reported Ms. Clayborn's statement to Mr. Blevins and Ms. Kimzey. On Monday, March 26, 2018, Mr. Blevins came to Ms. Pearson's office

between 8:45am and 9:00am. According to Ms. Pearson, Mr. Blevins apologized for making Ms. Pearson feel like he was discriminating against her and told her that "he thought very highly of [her] and he looked at [her] like family and he felt comfortable joking with [her] in that way."

Later that same morning, Mr. Blevins and Ms. Kimzey asked Ms. Pearson to come over to Mr. Blevins' office in Suite 202.[4] The record reflects that Ms. Kimzey had since been made aware of Ms. Clayborn's remark at the bar, and she wanted to investigate the allegation. During that meeting, Mr. Blevins advised Ms. Kimzey that he had apologized for the comment and Ms. Pearson advised her that she believed his apology was sincere. Ms. Kimzey and Mr. Blevins also told Ms. Pearson at this time that they wanted to move her office into Suite 202 from Suite 203 so that she could focus on her duties "because the staff in Suite 203, [plaintiff] and Magan Brown, were not fulfilling their duties, and oftentimes, just to not disrupt the flow of work, I would assist with those duties and it would impact my ability to complete by own duties." During this conversation, Mr. Blevins told Ms. Pearson that they were not moving her to Suite 202 because she is black. Ms. Pearson testified that she believed that Mr. Blevins made that comment as a way to reference their earlier discussion that morning and that he was "trying to make light of a, probably, tense situation."

Plaintiff testified that she overheard the comment made by Mr. Blevins about moving Ms. Pearson to a smaller office on the corporate side. According to plaintiff, Mr. Blevins said "Don't think I'm doing this—or what was it—don't think you're getting the smaller office because you're black." Plaintiff testified that she approached Ms. Pearson about it, who then relayed to her Mr.

---

[4] The record reflects that SHH and FHH operated in adjoining office suites. The parties and witnesses generally refer to Suite 202 as the "corporate side."

Blevins' initial comment as well and the fact that the comments made her uncomfortable.  Plaintiff testified that Ms. Pearson described the first comment as "Don't think this is happening because you're black, or don't think this is not happening because you're black."  Plaintiff testified that she then reported both comments, and the fact that Ms. Pearson was "uncomfortable" about those comments, to Ms. Clayborn as her supervisor.  There is no evidence that plaintiff perceived that Mr. Blevins, when making the remarks, bore any animus toward Ms. Pearson or that he made those remarks in any manner that could be deemed threatening or harsh.  Indeed, there is no evidence that plaintiff understood Mr. Blevins' remarks as anything other than an arguably poor attempt at a joke—and that he was stating that he was not discriminating against Ms. Pearson based on her race.  At some point after plaintiff made her report to Ms. Clayborn, Ms. Clayborn told Ms. Kimzey about plaintiff's report.

Ms. Pearson testified that, after hearing about the second remark, Ms. Brown told her that she should sue Mr. Blevins for mistreatment and that Ms. Clayborn continued to attempt to convince her that Mr. Blevins was treating her differently based on race in terms of pay and bonuses, and that she had been hired to fill a quota.  Ms. Pearson testified that she began to worry about her job with FHH because Ms. Clayborn was her direct supervisor who might retaliate against her "if I did not go along with the things that she wanted me to do."  Ms. Pearson testified that plaintiff, Ms. Brown and Ms. Clayborn had numerous discussions with her "three to four times a week" about Mr. Blevins' alleged racism.  She described the situation as "difficult" and "stressful."

By the end of April 2018, the employment of both plaintiff and Ms. Clayborn had been terminated and Ms. Brown quit her employment asserting a constructive discharge.  Ms. Pearson

is still employed by SHH and/or FHH. Defendant asserts that it terminated plaintiff's employment for attendance and performance-related issues. Defendant contends that Ms. Clayborn, Ms. Brown and plaintiff, after their employment had ended, contacted current FHH employees and instructed those employees to accept patients on the "no-take-back list" and to take patients without doctor approval in an effort to sabotage defendant's business. Copies of group text messages in the record support this contention. Plaintiff denies any wrongdoing but admits that she was included in a group text directing a current employee to take proprietary information from FHH. Defendant further asserts that plaintiff, Ms. Brown and Ms. Clayborn conspired to remove operational manuals from defendant's office and to remove the no-take-back list and that those materials disappeared from the office.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.    Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc*., 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc*., 726 F.3d at 1143 (quotation omitted). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of

evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

The legal standard does not change if the parties file cross-motions for summary judgment. Each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *Atlantic Richfield Co. v. Farm Cr. Bank*, 226 F.3d 1138, 1148 (10th Cir. 2000).

## III.   Retaliation Claim

Plaintiff asserts in the pretrial order that defendant terminated her employment in retaliation for reporting race discrimination to Ms. Clayborn, who then allegedly passed plaintiff's report on to Ms. Kimzey.  The court assesses plaintiff's retaliation claim under the *McDonnell Douglas* framework.  *Daniels v. United Parcel Serv., Inc*., 701 F.3d 620, 638 (10th Cir. 2012).[5] To state a prima facie case for retaliation, plaintiff "must show (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action." *Id*. (quoting *Hinds v. Sprint/United Mgmt. Co*., 523 F.3d 1187, 1202 (10th Cir. 2008)).  If plaintiff presents a prima facie case of retaliation, then defendant must respond with a legitimate, nonretaliatory reason for the challenged action. *Debord*

---

[5] The court's analysis of plaintiff's Title VII claim applies equally to her claim under § 1981. *See Crowe v. ADT Security Servs., Inc*., 649 F.3d 1189, 1194 (10th Cir. 2011) ("A plaintiff may prove violation of Title VII or 42 U.S.C. § 1981—the standards are the same—either by direct evidence of discrimination, or by adhering to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).").

*v. Mercy Health Sys. of Kansas, Inc.*, 737 F.3d 642, 656 (10th Cir. 2013). Plaintiff, then, must show that defendant's stated reason is pretextual. *Id.*

In their cross-motions for summary judgment, both parties urge that summary judgment is appropriate on plaintiff's retaliation claim for a host of reasons. In the end, however, this case turns on a very limited issue—whether plaintiff engaged in "opposition protected by Title VII" when she reported the statement that she overheard Mr. Blevins make to Ms. Pearson and the additional statement that Ms. Pearson relayed to her. Defendant contends that summary judgment is warranted because the evidence viewed in the light most favorable to plaintiff demonstrates that her complaint was not based on an objectively reasonable belief that the conduct she opposed violated federal anti-discrimination laws. Plaintiff contends that summary judgment is warranted in her favor on this issue because she reported in good faith what she subjectively believed to be race discrimination. As will be explained, defendant's motion is granted because no reasonable person could have believed that Mr. Blevins' statements violated Title VII's standard. Plaintiff's motion for summary judgment, which is based on outdated Tenth Circuit case law requiring only a subjectively good-faith belief that Title VII has been violated rather than an objectively reasonable one, is denied.

To establish the first prong of her prima facie case of retaliation, plaintiff must show that she had a reasonable, good-faith belief that she was opposing discrimination prohibited by Title VII. *See Crumpacker v. Kansas Dep't of Human Resources*, 338 F.3d 1163, 1171 (10th Cir. 2003). A plaintiff need not establish an "actual violation" of the statute. *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015–16 (10th Cir. 2004) (plaintiff need not prove actual violation of Title VII but only a "reasonable, good-faith belief" that the conduct was prohibited by Title VII). In

*Crumpacker*, the Circuit held that the Supreme Court's opinion in *Clark County School District v. Breeden*, 532 U.S. 268 (2001) superceded and overruled the Circuit's prior decisions— including those relied upon by plaintiff in her submissions—permitting plaintiffs to maintain retaliation claims based solely on a subjective (even if unreasonable) good-faith belief that the challenged conduct violated Title VII.

In *Breeden*, the plaintiff argued that she was retaliated against for complaining to higher management about an incident that had taken place when she met with her male supervisor and one male co-worker to review applications for a job opening. 532 U.S. at 269–70. During the meeting, plaintiff's supervisor read aloud a sexually explicit comment from an applicant's psychological evaluation report. *Id.* at 269. Plaintiff's male supervisor looked at plaintiff, and stated, "I don't know what that means." *Id.* Another male employee replied, "Well, I'll tell you later," and both men chuckled. *Id.* Plaintiff complained about the comment to and subsequently filed a Title VII retaliation claim, asserting that she was punished for her complaint. *Id.* at 270. The district court granted summary judgment to the school district, but the Ninth Circuit reversed, concluding that a genuine issue of material fact existed as to whether plaintiff had engaged in protected activity. *Id.* at 269. The Supreme Court reversed the Ninth Circuit, holding that "no reasonable person could have believed that the single incident . . . violated Title VII's standard." *Id.* at 271. Looking to the underlying substantive law applicable to sexual harassment claims, the Court held that the single incident "cannot remotely be considered 'extremely serious,' as our cases require." *Id.* (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)).

After *Breeden* and *Crumpacker*, then, a plaintiff asserting a retaliation claim must establish that his or her subjectively good-faith belief that the challenged conduct violated Title VII was

objectively reasonable.[6]  To determine whether a reasonable person in plaintiff's position could have believed that she was opposing prohibited conduct, the court looks to the underlying substantive law.  *See Held v. Ferrellgas, Inc.*, 505 Fed. Appx. 687, 690 (10th Cir. 2012) (citing *Breeden*, 532 U.S 268).  Although the specific comment allegedly overheard by plaintiff involved moving Ms. Pearson to a smaller office in Suite 202, the record reflects that Ms. Pearson was not in fact moved to a smaller office in Suite 202 because her desk did not fit in that office.  The record, then, does not reveal that Ms. Pearson suffered an arguably adverse employment action and plaintiff does not suggest otherwise.  Thus, in the specific context of this case, plaintiff must show that a reasonable person could believe that Mr. Blevins' remarks constituted racial harassment.[7]

Title VII prohibits racial harassment to the extent the harassment creates a hostile work environment.  *See Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 891 (10th Cir. 2018)).  This happens "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Id.* (quotations omitted) (affirming grant of summary judgment on retaliation claim where plaintiff could not reasonably believe that reported conduct met the "high bar needed to alter the conditions of [her] employment."  To determine whether the harassment is sufficiently severe or pervasive as to create a hostile

---

[6] The court assumes without deciding that plaintiff has set forth sufficient evidence that she subjectively believed in good faith that Mr. Blevins' comments violated Title VII.  In this memorandum and order, the court is concerned only with the objective component of the "reasonable, good-faith belief" test.

[7] The initial comment relayed to plaintiff from Ms. Pearson is undisputedly not an adverse action.

environment, the court considers various factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015)  In demonstrating these factors, the plaintiff "must show more than a few isolated incidents" of enmity. *Id.* at 1223 (quoting *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998)). "Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Id.* at 1223 (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)).

When faced with evidence of isolated racial slurs by a supervisor, some Circuit Courts of Appeals have found that a single incident can support a harassment claim and, thus, can support a reasonable belief that such conduct constituted racial harassment in violation of the law. *See Castleberry v. STI Group*, 863 F.3d 259, 267 (3rd Cir. 2017) (allegation that supervisor used term "nigger" on one occasion while threatening termination was sufficient to support reasonable belief that Title VII had been violated; reversing 12(b)(6) dismissal of retaliation claim); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (supervisor's use of the epithet "porch monkey" on two occasions over two-day period while angrily threatening termination of employment was sufficient for jury to find that plaintiff had a reasonable belief that a hostile work environment was in progress); *Alexander v. Gerhardt Enters., Inc.,* 40 F.3d 187, 195–96 (7th Cir. 1994) (finding that district court did not clearly err in finding after trial that plaintiff reasonably believed that a single use of term "nigger" was racially offensive and violated the law). While these cases certainly support the principle that a single comment can suffice to support a

reasonable belief that Title VII has been violated, each of these cases involved a serious racial slur and, thus, are easily distinguishable from the facts presented here.

The court has not uncovered any Tenth Circuit cases addressing the issue here—whether an isolated remark by a supervisor can support a reasonable belief that Title VII has been violated. Two unpublished decisions by the Circuit strongly suggest, not surprisingly, that reporting an isolated remark by a co-worker will not support the "protected opposition" element of a retaliation claim. In *Robinson v. Cavalry Portfolio Services, LLC*, 365 Fed. Appx. 104, 106 (10th Cir. 2010), the Circuit reversed a jury verdict in favor of the plaintiff on her retaliation claim. In that case, the plaintiff had provided a witness statement about a conversation she had with a coworker who asked her if she "only dated black guys" and then repeatedly used the term "nigger" while referencing other people. *Id*. at 108. Relying in large part on *Breeden*, the Circuit held that a "complaint of a single racist remark by a colleague, without more, is not 'opposition protected by Title VII.'" *Id*. at 112 (quotation omitted). Similarly, in *Gaff v. St. Mary's Regional Medical Center*, 506 Fed. Appx. 726, 727 (10th Cir. 2012), the Circuit rejected a retaliation claim (and affirmed the district court's grant of summary judgment on that claim) where the plaintiff reported that her coworker said to her, "All you need is a good f---." The Circuit reiterated that a plaintiff's good-faith belief must be reasonable and concluded that it was not reasonable for the plaintiff to believe she was subjected to a hostile work environment based on the one comment. *Id*. at 728.

These "coworker" cases, however, are not particularly helpful because the fact that Mr. Blevins was Ms. Pearson's supervisor is an important distinction. *See Robinson*, 365 Fed. Appx. at 113 (employee's report did "not claim Cavalry did anything wrong," only that a co-employee did something wrong); *see EEOC v. Rite Way Serv., Inc*., 819 F.3d 235, 243 (5th Cir. 2016)

(opposition clause claims grounded in isolated comments often turn on whether the conduct came from a person in a supervisory position or a fellow employee). In the absence of any particularly persuasive authority from the Tenth Circuit, the court looks elsewhere for guidance. In *Boyer-Liberto v. Fontainebleau Corp.*, the Fourth Circuit, in an en banc opinion addressing the isolated comments of a supervisor, specifically addressed the question of "What is the proper standard for determining whether an employee who reports an isolated incident of harassment has a reasonable belief that she is opposing a hostile work environment in progress?" 786 F.3d at 284. Answering that question, the Fourth Circuit explained:

> We conclude that, when assessing the reasonableness of an employee's belief that a hostile environment is occurring based on an isolated incident, the focus should be on the severity of the harassment. *Cf. Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001) (looking to severity of single incident in evaluating reasonableness of employee's belief that incident created actionable hostile environment). That assessment thus involves factors used to judge whether a workplace is sufficiently hostile or abusive for purposes of a hostile environment claim—specifically, whether the discriminatory conduct "is physically threatening or humiliating, or a mere offensive utterance." *See Harris*, 510 U.S. at 23. Of course, a single offensive utterance—e.g., "simple teasing" or an "offhand comment[ ]," *see Faragher*, 524 U.S. at 788—generally will not create a hostile environment without significant repetition or an escalation in the harassment's severity. *See Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572, 579 (D.C.Cir. 2013) (Kavanaugh, J., concurring) ("The more severe the harassment, the less pervasive it needs to be, and vice versa." (internal quotation marks omitted)). But an isolated incident that is physically threatening or humiliating will be closer—even if not equal—to the type of conduct actionable on its own because it is "extremely serious." *See Faragher*, 524 U.S. at 788.

*Id*. Applying that standard, the Fourth Circuit easily concluded that a jury could find that the plaintiff reasonably believed that she had been subjected to racial harassment when she reported that her supervisor had used the term "porch monkey" on two occasions over a two-day period

during a verbal assault on the plaintiff in which the supervisor threatened the termination of the plaintiff's employment. *Id.* at 285.

Because the standard adopted by the Fourth Circuit in *Boyer-Liberto* is consistent with *Breeden* and with Tenth Circuit case law recognizing that a single incident of harassment, if extremely serious or physically threatening, can be sufficient to create a hostile work environment, *see Macias v. Southwest Cheese Co.*, 624 Fed. Appx. 628, 636 & n.9 (10th Cir. Aug. 24. 2015) (citing cases); *Morris v. City of Colorado Springs*, 666 F.3d 654, 667 (10th Cir. 2012), the court believes that the Circuit would utilize a standard similar to that endorsed by the Fourth Circuit in *Boyer-Liberto*. Applying that standard here, summary judgment is required in favor of defendant because no reasonable jury could find that plaintiff reasonably believed that Ms. Pearson had been subjected to racial harassment. Plaintiff testified that she overheard Mr. Blevins tell Ms. Pearson, "Don't think you're getting the smaller office because you're black." There is no evidence that plaintiff misunderstood the comment such that she believed Mr. Blevins was assigning a particular office to Ms. Pearson based on her race. There is no evidence that plaintiff had knowledge of any additional facts whatsoever that might help her understand the nature or context of what was transpiring between Mr. Blevins and Ms. Pearson. The only evidence as to the context of the statement was provided by Ms. Pearson. She testified that she believed that Mr. Blevins's comment was a reference to the discussion that they had had earlier in the day when Mr. Blevins had apologized for his initial remark. According to Ms. Pearson, Mr. Blevins was "trying to make light of a, probably, tense situation" and wanted her to move offices so that she could focus on her own job duties without the disruption caused by plaintiff and Ms. Brown. Significantly, plaintiff has no evidence that she believed or perceived this remark in some manner other than

that described by Ms. Pearson. There is no evidence that plaintiff had knowledge that Mr. Blevins intended anything by this remark other than what he said—that he was moving her to an office on the corporate side but that the move was not based on her race. Thus, the evidence reflects only that when she reported this comment to Ms. Clayborn, she neither possessed nor reported any context for the statement that she reported—"Don't think you're getting the smaller office because you're black."

At the same time that she reported the comment she overheard, plaintiff reported the initial comment made by Mr. Blevins that Ms. Pearson had shared with her when they discussed the second comment. Again, there is no evidence that plaintiff had knowledge of the context of that remark or any knowledge of any circumstances surrounding the remark. There is no evidence that she knew or reported anything other than what Ms. Pearson told her which, as described by plaintiff, was that Mr. Blevins said: "Don't think this is happening because you're black, or don't think this is not happening because you're black." Plaintiff does not contend or suggest that she had knowledge that the circumstances surrounding Mr. Blevins' remark were anything other than the circumstances described by Ms. Pearson:

> He came over to my office in Suite 203, and he was letting me know that we were going to be hiring some more employees and that they would potentially have a pick of their office, and he wanted to give me the opportunity to choose before them since I had been there longer, and he jokingly stated that he didn't want to not give me that opportunity and then me assume that it was because I was black.

Viewing the evidence in the light most favorable to plaintiff, then, she reported to her supervisor that Mr. Blevins told Ms. Pearson that he was <u>not</u> moving her to a smaller office based on race and that he did not want her to think that he had not given her the chance to pick a new office based on her race. There is no evidence that plaintiff, at the time she made her report, had any

other knowledge about Mr. Blevins' conduct toward plaintiff or his conduct in the office generally that might bear on whether she believed that she was reporting race discrimination or racial harassment or on whether she believed that Mr. Blevins bore any racial animus toward Ms. Pearson.  Standing alone, then, Mr. Blevins' remarks are a far cry from the disturbing racial slurs utilized by supervisors or coworkers in the cases discussed above.  Moreover, while plaintiff offers no context for Mr. Blevins' remarks, Ms. Pearson's testimony provides a great deal of insight into whether Mr. Blevins bore any animus toward her based on her race:

> He would treat me differently in the fact that he would state constantly that I was his favorite.  He would publicize how great I was, and he would tell Danielle, Patty and Magan, Amber is my favorite, or I'm going to come hang out with Amber because you guys are bickering and Amber doesn't do that, so he just stated that he was—he liked me.

While Ms. Pearson concedes that the comments made her "uncomfortable," she testified that she was not offended by those comments.  Plaintiff does not dispute those facts.  Ms. Pearson also emphasized that Mr. Blevins apologized for referencing her race and told her that he never intended to offend her and that "he thought very highly of me and he looked at me like family and he felt comfortable joking with me in that way."  Plaintiff has come forward with no evidence controverting any of Ms. Pearson's testimony on these issues.

In the end, the comments made by Mr. Blevins are most analogous to the comment made by the supervisor in *Breeden*—"at worst an isolated incident that cannot remotely be considered extremely serious."  523 U.S. at 271.  Mr. Blevins' comments simply cannot be characterized as severe under any reasonable interpretation of the pertinent case law.  Undisputedly, Mr. Blevins did not make the remarks in anger or in a physically threatening manner.  There is no evidence from which the jury could conclude that Mr. Blevins bore any racial animus toward Ms. Pearson

in making those comments or that the comments were the product of any racially discriminatory intent.  No reasonable person could believe that the conduct reported by plaintiff was so severe that it altered a term, condition, or privilege of Ms. Pearson's employment and created an abusive working environment.  Stated another way, no jury could find that plaintiff reasonably believed that she was confronting racial harassment in the workplace.  Summary judgment in favor of defendant is granted.

## IV.    Defendant's Counterclaims

Defendant asserts three counterclaims against plaintiff—tortious interference with business expectancy; conversion; and breach of fiduciary duty.  Defendant also alleges the existence of a civil conspiracy for purposes of imputing liability to plaintiff for the acts of Ms. Clayborn and Ms. Brown.  Each claim is asserted under Kansas law.   Plaintiff moves for summary judgment on each of the claims for numerous independent reasons but, in the end, the threshold issue raised by plaintiff—defendant's failure to allege actual damages—is dispositive of whether defendant may proceed to trial on their counterclaims.  As will be explained, because defendant has not asserted a claim for actual damages in any respect, summary judgment is warranted on each of its counterclaims.

In the pretrial order, defendant asserts the following claim for damages:  "Defendant seeks only nominal damages for each of Defendant's counterclaims sufficient to support Defendant's claim for punitive damages on each of Defendant's claims."[8]  As plaintiff highlights in her motion

---

[8] Plaintiff asserts that defendant waived any claim for nominal or punitive damages by failing to include those damages in its Rule 26(a) disclosures (and by expressly asserting in those

for summary judgment, a verdict for actual damages is essential to the recovery of punitive damages under Kansas law. *See Wendt v. Univ. of Kan. Med. Ctr.*, 274 Kan. 966, 982 (2002); *Lindquist v. Ayerst Labs., Inc.*, 227 Kan. 308, 316 (1980); *Stoner v. Wilson*, 140 Kan. 383, 394 (1934) ("It requires no citation of authority that before exemplary or punitive damages may be awarded there must be actual damages and a right of recovery therefore established."); *see also Hawkinson v. Bennett*, 265 Kan. 564 (1998) (approving jury instruction that instructed that jury could award punitive damages on breach of fiduciary duty and/or tortious interference with prospective business relations claim if jury found that plaintiff was entitled to recover actual damages on those claims); PIK Civ. 4th 171.44 ("If you award the plaintiff actual damages, then you may consider whether punitive damages should be allowed.").

Defendant confirmed at the pretrial conference before the magistrate judge that it was seeking only "a nominal damage, because we'll need that to support the punitive damage claim." Counsel for defendant explained that while the defendant had spent time trying to find the missing manuals, ultimately the manuals were easily recreated because they were authored by Ms. Pearson and maintained on Ms. Pearson's computer in electronic format. *See* Tr. of Pretrial Conference, Doc. 171 at 7. As further explained by counsel at the pretrial conference, defendant does not intend to put on any evidence of damages sustained as a result of the time spent looking for the

---

disclosures that damages were "not applicable") and by failing to include any claim for damages in the proposed pretrial order that was reviewed at the first pretrial conference. This argument is rejected. At the second pretrial conference when the parties reviewed a revised draft of the parties' proposed pretrial order that included a claim for defendant's damages, plaintiff objected to that claim. The magistrate judge overruled the objection, finding that defendant had included a claim for damages when it initially asserted the counterclaims in its answer. If plaintiff wanted this court to review that decision, she was required to file an objection to the final pretrial order.

manuals or any evidence concerning the amount of time defendant spent looking for them. *Id.* at 8-9. Rather, defendant's counsel asserted that defendant was essentially seeking only punitive damages for plaintiff's actions and the nominal damages claim was only necessary to "support the punitive damage claim." *Id.* Thus, as described by defendant's counsel at the pretrial conference and as confirmed in the pretrial order, defendant is not claiming that it sustained any actual damages from plaintiff's alleged misconduct. Under Kansas law, defendant cannot obtain an award of punitive damages and summary judgment is granted on defendant's claim for punitive damages.[9]

That leaves only defendant's claim for nominal damages. But as plaintiff points out in her motion for summary judgment, each counterclaim asserted by defendant requires proof of actual damages as an element of the claim. Because defendant admits that it will not put on evidence of actual damages at trial, summary judgment is required on each claim. *See Osage Capital, LLC v. Bentley Investments of Nevada III, LLC*, 2014 WL 902189, at *7-8 (Kan. Ct. App. Mar. 7, 2014) (where plaintiffs failed to provide evidence of any damages stemming from alleged breach of fiduciary duty, summary judgment was required); *Byers v. Snyder*, 44 Kan. App. 2d 380, 395 (2010) (affirming grant of summary judgment on tortious interference claim where plaintiff had no evidence of damages suffered as a direct and proximate cause of the alleged misconduct); *Turner v. Halliburton Co.*, 240 Kan. 1, 12 (1986) (elements of claim for tortious interference with business expectancy include damages as a direct or proximate result of the defendant's conduct);

---

[9] While punitive damages may be awarded incident to equitable relief without an award of actual damages, *see Wells Fargo Vendor Fin. Servs., LLC v. Nationwide Learning, LLC*, 56 Kan. App. 2d 259, 284 (2018), that exception does not apply to this case.

*Meek v. Union Pacific Railroad Co.*, 95 Kan. 111 (1915) (where evidence showed that the plaintiff had not sustained any damages and could recover no more than nominal damages on his conversion claim, case was reversed with instructions to enter judgment for defendant); *State v. Kelly*, 78 Kan. 42, 44–45 (1908) (where no actual damage was alleged in petition for conversion, lower court properly sustained demurrer to petition despite fact that defendant may have been liable for nominal damages); *see also Restatement (Second) Torts* § 907 ("If actual damage is necessary to the cause of action, as in negligence, nominal damages are not awarded.").[10]

In response to plaintiff's motion for summary judgment, defendant set forth only two arguments. First, defendant contends that plaintiff's "argument on damages has already been rejected by the magistrate." The record clearly does not support this argument. While the magistrate judge overruled plaintiff's "waiver" objection as to whether defendant was entitled to assert a claim for damages at all, the magistrate judge cautioned defendant that its assertion of nominal damages to support a punitive damages claim "most assuredly will, I presume, lead to a summary judgment issue for plaintiff." The magistrate judge, then, certainly did not reject the argument that, in the absence of any evidence or claim for actual damages, summary judgment is required on the claim for punitive damages as well as every substantive claim for relief.

Second, defendant contends that "no allegation of actual damages is necessary to establish a cause of action and nominal damages may be awarded" in an intentional tort case. The two

---

[10] Because the court has ruled that none of defendant's counterclaims can proceed to trial, defendant's derivative civil conspiracy claim necessarily fails. *See Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo., Inc.,* 431 F.3d 1241, 1268 (10th Cir. 2005) (under Kansas law, grant of summary judgment on underlying tort claims requires grant of summary judgment on civil conspiracy claim).

cases cited by defendant are easily distinguishable from the facts here. In *Nanodetex Corp. v. Sandia Corp.*, 2007 WL 9710538, at *6 (D.N.M. Oct. 15, 2007), the court applied New Mexico law to a tortious interference claim to reject the counterclaim defendant's argument that the counterclaim plaintiff had "insufficient evidence of monetary damages." *Id*. at *5. The court held that the lack of evidence of specific monetary damages was not grounds for summary judgment where the defendant was not able to quantify the actual damages it may have suffered when potential investors declined to enter into contracts with the defendant based on the plaintiff's conduct. *Id*. at *6. Defendant's failure here is not an inability to quantify actual damages, but an inability to claim or demonstrate any injury whatsoever. In *Gross v. Capital Electric Line Builders, Inc*., 253 Kan. 798, 800 (1993), the Kansas Supreme Court reiterated the rule in Kansas which allows a trespass plaintiff who can show no actual loss to recover nominal damages. Unlike a claim of conversion, tortious interference or breach of fiduciary duty, a claim of trespass does not require a showing of actual damages as an element of the cause of action. *See Longenecker v. Zimmerman*, 175 Kan. 719, 721 (1954) ("From every direct invasion of the person or property of another, the law infers some damage, without proof of actual injury. In an action of trespass the plaintiff is always entitled to at least nominal damages, even though he was actually benefited by the act of the defendant.").

In sum, because defendant has failed to allege any actual damages with respect to its counterclaims, and because actual damages are required elements of each of those claims, summary judgment in favor of plaintiff is granted on each of defendant's counterclaims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's motion for summary judgment (doc. 155) is granted as to each of defendant's counterclaims and is denied as to plaintiff's retaliation claim; and defendant's motion for summary judgment (doc. 157) is granted on plaintiff's retaliation claim.

**IT IS SO ORDERED.**

Dated this  14th day of August, 2019, at Kansas City, Kansas.

<div style="margin-left:50%">

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

</div>